## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**RUSSELL JENKINS,**

       **Plaintiff,**

   **v.**

**ORANGE POLICE DEP'T, et al.,**

       **Defendants.**

Civ. No. 2:11-1555

   (KM)(MCA)

**OPINION**

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

The plaintiff, Russell Jenkins, alleges civil rights causes of action for false arrest, as well as other claims, under 42 U.S.C. §§ 1981, 1983, 1985, and 1986; the New Jersey Civil Rights Act ("NJCRA"); and the New Jersey Law Against Discrimination ("LAD"). Am Compl. (ECF No. 8). Named as defendants are the City of Orange Board of Education ("BOE") and three school employees, Judith Kronin, Erica Stewart,[1] and Belinda Smiley (together, the "School Defendants"); as well as the City of Orange, the Orange Police Department and Detective M. Tingolie (the "City Defendants"). Now before the Court are motions for summary judgment by the School Defendants (ECF No. 74), and by the City Defendants (ECF No. 79). Jenkins has moved to vacate a stipulation of dismissal as to Defendant S.L., a minor. (ECF No. 96).

This case arises from an altercation between Jenkins, a substitute teacher, and S.L., a student, at a public high school in Orange, New Jersey. It is undisputed that Jenkins, attempting to confiscate S.L.'s cell phone, laid hands on her and carried her into the hallway. The incident resulted in the filing of criminal charges, later downgraded to simple assault, of which Jenkins was ultimately acquitted.

Any teacher will acknowledge the frustrations of dealing with a defiant adolescent, and a substitute teacher, who has no ongoing relationship with the

---

[1]    Erica Stewart was improperly pleaded as "Erica Boyer." *See* SDSMF (ECF No. 74-8) at 1.

students, may face additional challenges. This Court is not called upon, however, to adjudicate S.L.'s alleged violation of school rules; to determine whether Jenkins's response was ideal; or to find that his acquittal of assault was or was not justified. The central issue (there are others) is whether the facts indisputably known to the school and the police amounted to probable cause. That standard is far lower than the burden of proof in a criminal prosecution, and it does not require that the officials on the scene have conducted a sensitive balancing of inculpatory and exculpatory factors.

For the reasons stated below, I find that there was probable cause for Jenkins's arrest. The Defendants' motions for summary judgment are **GRANTED.** The Plaintiff's motion to vacate the stipulation of dismissal as to S.L. is **DENIED**.

## I.      BACKGROUND

The facts set forth below are taken from the statements of material facts submitted by the School Defendants and the City Defendants, and the responsive statements of material facts submitted by Jenkins, together with the corresponding exhibits submitted in support.[2]

### A. Parties

The plaintiff, Russell Jenkins, is a resident of New Jersey. He was certified as a substitute teacher by the New Jersey Department of Education in October of 2008. He identifies himself as African-American, a fact relevant to some of his claims. SDSMF ¶¶ 1, 4.

Defendant Judith Kronin was the Interim Superintendent of Schools for the Orange BOE. Defendant Erica Stewart was the principal of Orange High School. Defendant Belinda Smiley was the Director of Human Resources. *Id.* ¶ 21. Kronin, Stewart, and Smiley are African-American. *Id.* ¶ 55 (citing Ex. P, Pl. Dep. at 69), ¶ 80.

The City of Orange ("Orange" or "the City") is a municipality in the state of New Jersey. Under New Jersey Law, the Orange Police Department is not a

---

[2]     "SDSMF" refers to the School Defendants' Statement of Material Facts (ECF No. 74-8). "CDSMF" refers to the City Defendants' Statement of Material Facts (ECF No. 79-3). "RSMF1" refers to the statement Jenkins submitted in response to the SDSMF (ECF No. 100, incorporated in Opposition at p.7). "RSMF2" refers to Jenkins's statement in response to the CDSMF (ECF No. 99, incorporated in Opposition at p. 7).

separate legal entity, but a department of the municipality. N.J. Stat. Ann. § 40A:14–118 (municipal police department is "an executive and enforcement function of municipal government").[3] Defendant Michael Tingolie was at all relevant times a detective for the Orange Police Department.

## B.    Facts

On September 9, 2008, the BOE conditionally hired Jenkins as a substitute teacher, pending his certification by the state. SDSMF ¶ 3; Ex. B, BOE Letter to Pl. Substitute teachers at Orange High School receive training annually in August, and also receive introductory packets containing tips for defusing "volatile situations." *Id.* ¶ 78 (citing Ex. T, Stewart Dep. at 46-47). Hiring of substitutes during the year is handled by Human Resources.[4] *Id.* The School Defendants assert that teachers are instructed not to confiscate students' personal property. *Id.* ¶ 79 (citing Ex. T, Stewart Dep. at 47-48). Jenkins, however, asserts that Defendants have not shown that there is a policy to that effect. RSMF1 ¶ 79.

On February 27, 2009, Jenkins reported for work as a substitute teacher at Orange High School. *Id.* ¶ 5. His last prior employment as a substitute teacher had been 12 years earlier, in 1997. *Id.* ¶ 7 (citing Ex. C, Crim. Trial Tr. at 81.). On March 6, 2009, he reported to the high school for a second day of substitute teaching. *Id.* ¶ 8 (citing Ex. A, Am. Compl.; Ex. C at 81).

On that day, March 6, 2009, Jenkins was assigned to cover a second period 10th grade science class in room 239. *Id.* ¶ 9. S.L. was a student in the class. At the time, S.L. was fifteen years old; she stood five feet tall and weighed approximately 105 pounds. *Id.* ¶ 10 (citing Ex. D, Arrest Record). Jenkins was 43 years old and six feet three inches tall, and he weighed approximately 299

---

[3]     *See also Adams v. City of Camden*, 461 F. Supp. 2d 263, 266 (D.N.J. 2006); *McGovern v. Jersey City*, No. 98-CV-5186 2006 WL 42236, at *7 n.4 (D.N.J. Jan. 6, 2006) (police departments cannot be sued in conjunction with municipalities because police departments are administrative arms of local municipalities, not separate entities); *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004) (same); *DeBellis v. Kulp*, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001) (same).

[4]     Jenkins says he did not meet with Human Resources when he was hired, but does not deny that he received the introductory materials. RSMF1 ¶ 78.

pounds. *Id.*[5] At about 10:50 am, Jenkins attempted to confiscate S.L.'s cell phone. *Id.* ¶ 11 (citing Ex. E, Jenkins's Statement).

Jenkins testified at his deposition that S.L. was listening to music on her cell phone in the classroom. SDSMF ¶ 47. (citing Ex. P, Pl. Dep. at 44-45). He instructed several students to turn off their music devices, and then turned to S.L. *Id.* S.L. refused to turn off her cell phone at his request, so he physically removed the phone from her hand. *Id.* ¶ 48 (citing. Ex. P at 45). S.L. jumped from her desk to reach for the cell phone and grabbed Jenkins's hand in the process. *Id.* Jenkins states that he pushed S.L. back and that she stumbled backwards, falling back onto the "edge of her chair." *Id.* ¶ 49 (citing Ex. P at 45). He testified that S.L. then stood up, took "two skips" in his direction, and attempted to strike him. *Id.* ¶ 50. Jenkins deflected S.L.'s fist with his hand; the momentum of his swing spun her around 180 degrees. *Id.* ¶ 51 (citing Ex. P at 46). While S.L. was facing the back of the classroom, Jenkins picked her up and carried her into the hallway. *Id.* ¶ 52 (citing Ex. P. at 46, 52, 56).

Vice Principal Dana Gaines and Security Officers Lisa King and Mike Jiggets were in the hallway. They state that they saw Jenkins carrying S.L. in a headlock. SDSMF ¶ 13 (citing Ex. F, Incident Reports).

Jenkins does not dispute that when the confrontation escalated, he picked up S.L. and carried her into the hallway. SDSMF ¶ 52. He denies using a headlock. He testified at his deposition that his grip on S.L. was like a bear hug: his arms were placed around S.L., above her "breast area," and her arms were at her sides. *Id.* (Ex. P. at 56); *see also* Am. Compl. ¶ 18.

Once in the hallway, Jenkins carried S.L. in the direction of the Security Officers. *Id.* SDSMF ¶¶ 14, 15 (citing Ex. A). Jenkins testified in his deposition, but now seems to dispute, that the officers were close by when they observed him carrying S.L.[6] *Id.* ¶ 53 (citing Ex. P. at 282); RSMF1 ¶ 53. Jenkins

---

[5]   Jenkins disputes these facts. RSMF1 ¶ 10.

[6]   Jenkins at one point disputed that Gaines and the officers were in the hallway when he emerged from the classroom. RSMF1 ¶ 13. He denied that the security guards were posted outside the classroom. *Id.* ¶ 77. He also testified, however, that the guards were 20 to 30 feet away when he began walking toward them. SDSMF Ex. P. at 282. He has testified that he (carrying S.L.) and the security guards "met in the middle." (*Id.*; *see also* Am. Cplt. ¶¶ 18-21). There was evidence that security officers are regularly assigned to the hallways of the school, and are posted outside of room 239, where the incident took place. Id. ¶ 77 (citing Ex. T, Stewart Dep. at 45).

acknowledged at one point that the guards would have seen the position in which he was holding S.L. *Id.* He asserts, however, that Gaines did not witness the incident. *Id.* ¶ 54 (citing Ex. P. at 46); RSMF1 ¶ 54.

Jenkins, at the direction of the school security officers, deposited S.L. on the floor. *Id.*; *see also* Am. Compl. ¶¶ 19-21. S.L. was then escorted to the nurse's office, where she was treated for minor neck injuries. *Id.* ¶ 17. The nurse observed red marks around the front of S.L's neck and two long scratches on her mid-neck. *Id.* (citing Ex. C; Ex. N, Nurse Report).

Shortly after the incident, Gaines instructed Jenkins to prepare a written report. SDSMF ¶ 18 (citing Ex. A; Ex. C; Ex. E, Jenkins Statement). Jenkins's written statement relates that, after he took the cell phone from S.L., she "swung" at him, and he "deflect[ed] the swings and took her into the hallway and called for security." Ex. E. S.L., too, provided a statement. S.L. reported that Jenkins had grabbed her from the back, that his "arms were around her neck," and that she was "having a hard time breathing." Ex. F.

Witness statements were taken from the two security officers, Vice Principal Gaines, and five of S.L.'s classmates. SDSMF ¶¶ 19-20. Security Officers King and Jiggets reported that they were walking down the hallway when they saw Jenkins with S.L. in a "headlock." Ex. F. Gaines's account was similar. *Id.* ¶ 20 (citing Ex. F). She stated that she was in the hallway outside of the classroom when she saw Jenkins "dragging [S.L.] into the hallway outside of room 239." Ex. F. Gaines stated that Jenkins had S.L. in a "headlock" and that the student was "flailing her arms and legs." *Id.*

Like the employee statements, the student witnesses' statements consistently state that Jenkins held S.L. by the neck. SDSMF Ex. I. The first statement said that he "picked her up by the neck and started choking [her] then dragged her in the hallway by her neck." *Id.* The second statement said that after they pushed each other, he "started choking her." *Id.* The third stated that he "put her in a sleeper." *Id.* The fourth statement said that he "put her in a choke hold and pushed her out of the classroom and kept her in the choke hold." *Id.* The fifth declarant said that he saw Jenkins "grab her around her neck and start dragging her out the door" and that Jenkins continued to "drag her into the hallway and choke her until someone [got] him off." *Id.*

Although there were security cameras in the school hallways, there is no video recording of the incident. The School Defendants assert that the cameras were not situated to capture the relevant events in the classroom or the

5

hallway. *Id.* ¶ 16 (citing Ex. G). Detective Tingolie reviewed the video footage and confirmed that the camera was not positioned to record the section of the hallway where the incident took place. *Id.* ¶ 62 (citing Ex. R, Tingolie Dep. at 12-14). The school's head of security would ordinarily back up video footage of an incident to a CD, especially if there had been police intervention; a CD backup would not be made, however, if the cameras did not capture a relevant incident. *Id.* ¶ 75 (citing Ex. T, Stewart Dep. at 23-25). Jenkins disputes Defendants' statements that the cameras did not record the incident. RSMF1 ¶ 16; RSMF2 ¶¶ 10, 50.

Upon learning of the Jenkins/S.L. incident, Interim Superintendent of Schools Judith Kronin convened a meeting with Jenkins, High School Principal Erica Stewart, and Human Resources Director Belinda Smiley. SDSMF ¶ 63 (citing Ex. S, Kronin Dep. at 8). After preparing his incident report, Jenkins was escorted to the Human Resources building for the meeting. *Id.* ¶ 21 (citing Ex. A). Dr. Kronin asked Jenkins to give his version of the altercation and, in response, Jenkins read the written statement he had prepared. *Id.* ¶ 22 (citing Ex. A). Stewart asked Jenkins what method he used to take S.L. into the hallway; he replied that he did it "in a way I would not get hit." *Id.* ¶ 23.

After the meeting, the school turned the matter over to its attorney for further handling. SDSMF ¶ 65 (citing Ex. S at 10-13, 27, 46). The school reported the incident to S.L.'s mother, to the State Division of Youth and Family Services ("DYFS"), and to the police. *Id.* ¶ 26 (citing Ex. F). S.L.'s mother requested that a police report be filed. *Id.* ¶ 27 (citing Ex. J, Tingolie Incident Report).[7] When the police arrived at the school, Jenkins was no longer in the building, so his statement was not taken then. SDSMF ¶ 28. No arrests were made at the time. *Id.* (citing Ex. J).

On March 10, 2009, Detective Michael Tingolie was assigned by the Orange Police Department to investigate the incident. SDSMF ¶ 29 (citing Ex. G, Tingolie Case Management Report). On or about March 12, 2009, Jenkins requested a copy of the police report. *Id.* ¶ 30 (citing Ex. A). Reviewing the report, he noticed that there was no reference to his written statement. *Id.* ¶ 31 (citing Ex. A). Defendants assert, but Jenkins disputes, that Detective Tingolie did not review the statement because Jenkins had not been read his Miranda

---

[7]     Jenkins disputes this and asserts that Defendants' evidence is hearsay. RSMF1 ¶ 27.

rights before completing it. *Id.* ¶ 32 (citing Ex. G); ¶ 59 (citing Ex. R, Tingolie Dep. at 22); RSMF1 ¶ 59.

Detective Tingolie did review the written statements from S.L., Gaines, and the two security officers. SDSMF ¶ 60 (citing Ex. R at 25). He did not speak with any student witnesses because their parents did not wish to cooperate with the investigation. *Id.* ¶ 61 (citing Ex. R at 10). On March 18, 2009, S.L. provided a sworn statement to Detective Tingolie. SDSMF ¶ 33 (citing Ex. G).

Tingolie then contacted Assistant Prosecutor Raymond Hoffman at the Essex County Prosecutor's Office. Hoffman advised him to charge Jenkins with aggravated assault and endangering the welfare of a child.[8] CDSMF ¶¶ 25, 52 (citing Ex. G). Tingolie placed those charges in a complaint and went to the Orange Municipal Court Deputy Court Administrator to request issuance of an arrest warrant for Jenkins. *Id.* ¶¶ 26-27. The Administrator found that there was probable cause and issued the warrant. *Id.* ¶ 28.[9] Jenkins disputes the validity of that finding of probable cause. RSMF1 ¶ 28.

On March 20, 2009, Jenkins was arrested and charged with one count of aggravated assault with bodily injury and one count of endangering the welfare of a child. SDSMF ¶ 34 (citing Ex. G). His bail was set at $35,000 with a 10% option. *Id.* ¶ 35 (citing Ex. L, Arrest Report and Warrant).

On April 1, 2009, Jenkins filed juvenile charges against S.L. for assault. SDSMF ¶ 36. Tingolie arrested S.L. eight days later. *Id.* (citing Ex. A, Ex. C at 72-73, Ex. D); CDSMF ¶ 55.

On April 13, 2009, the BOE removed Jenkins from the active substitute list for "unacceptable performance." SDSMF ¶ 37 (citing Ex. M, Kronin Letter). Jenkins asserts that the BOE and the other School Defendants discriminated against him. When asked at his deposition about the basis for his discrimination claims against the School Defendants, he stated that the foundation for the claim was "what they didn't do," meaning their failure to "show a concern or a duty of care for my well-being" after the incident. SDSMF Ex. P. at 71.

---

[8]     Jenkins disputes this. RSMF1 ¶ 26.

[9]     Evidently this was done under the authority of N.J. Ct. R. 7:2-1(d) ("The arrest warrant . . . shall be signed by the judge, or when authorized by the judge, by the municipal court administrator or deputy court administrator after a determination of probable cause.").

On June 2, 2009, S.L. and Tingolie provided grand jury testimony in the criminal matter *State of New Jersey v. Russell Jenkins*. SDSMF ¶ 38 (citing Ex. H). No board members, school administrators, or named School Defendants testified before the grand jury. *Id.* The grand jury found probable cause and indicted Jenkins for aggravated assault and endangering the welfare of a child. *Id.*

On September 16, 2010, the charges were downgraded to one count of simple assault, a disorderly persons offense triable by a judge. The Hon. Ronald Wigler, J.S.C., acquitted Jenkins of that assault charge. SDSMF ¶ 39 (citing Ex. C; Ex. O, Judgment of Acquittal); *see also* CSMF ¶ 42.

## C.   Procedural History

On March 18, 2011, Jenkins filed a complaint *pro se* in the United States District Court for the District of New Jersey. He applied to proceed *in forma pauperis*, and Hon. Esther Salas, the district judge then assigned to the case, granted his application on July 12, 2011. (ECF Nos. 1, 2). On November 14, 2011, Judge Salas entered a notice of call for dismissal pursuant to Fed. R. Civ. P. 4m for failure to serve a complaint. Jenkins then filed an amended complaint, *pro se*, on November 23, 2011. (ECF No. 8). Eventually answers were served, and the City filed a cross-claim, which was also answered.

On August 1, 2012, the case was reassigned from Judge Salas to me. (ECF No. 36). Jenkins requested pro bono counsel on September 19, 2012. (ECF No. 39).

S.L. was not served with the amended complaint until October 19, 2012. (ECF No. 46). S.L. received an extension of time to answer, and then filed a motion to dismiss the amended complaint for failure to state a claim. (ECF No. 50). The motion was fully briefed but never decided, because the claims against S.L. were voluntarily dismissed, *see infra*.

On January 18, 2013, Jenkins obtained counsel, Elizabeth Foster, who entered an appearance in the case. (ECF No. 64). At his deposition, Jenkins withdrew Count 6 of his complaint (negligent hiring, training, and screening of Orange BOE employees). CDSMF ¶ 43 (citing Pl. Dep. at 218-24).

The School Defendants moved for summary judgment on April 26, 2013. (ECF No. 74). In the meantime Jenkins retained new counsel, Audwin Levasseur. A consent order granting substitution of attorney was entered on

April 29, 2013. (ECF No. 75). Several days later, on May 3, 2013, a stipulation of dismissal with prejudice as to S.L. was entered by Foster (the first attorney) on Jenkins's behalf. (ECF No. 77). On May 9, 2013, the City Defendants moved for summary judgment. (ECF No. 79).

On May 31, 2013, Jenkins wrote directly to Magistrate Judge Arleo (although he was represented by counsel), objecting to the stipulation of dismissal as to S.L. because it had been entered by Foster without his consent when she was no longer his attorney. (ECF No. 82). On June 3, 2013, Counsel for S.L. submitted a letter in response, indicating that Jenkins's second attorney, Levasseur, had also agreed to the dismissal. S.L.'s position was that the dismissal was final. (ECF No. 83). Levasseur wrote to the Court on June 5, 2013, confirming that he met with Jenkins several times in March and April, 2013, to discuss the claims against S.L., and that Jenkins had consented to the dismissal. (ECF No. 84). Levasseur also communicated that Jenkins was an uncooperative client who wanted to terminate his attorney-client relationship with Levasseur. *Id.* Despite the uncertainty regarding his continued representation of Jenkins, Levasseur submitted papers in opposition to the motions for summary judgment on Jenkins's behalf. *See id.*

Jenkins did terminate the relationship with Levasseur. He applied again for pro bono counsel on June 24, 2013 (ECF No. 91), and sought permission to proceed *pro se* on July 1, 2013 (ECF No. 92). Judge Arleo granted Jenkins permission to proceed *pro se* and struck the briefs that now-fired counsel had submitted in opposition to summary judgment. (ECF Nos. 85, 94). The application for pro bono counsel was denied. (ECF No. 95).

On August 14, 2013, Jenkins moved *pro se* to vacate the stipulation of dismissal as to S.L. (ECF No. 96). He also filed new opposition briefs in opposition to the motions for summary judgment. (ECF Nos. 99, 100). The brief submitted in opposition to the School Defendants' motion, however, appears to be a copy of the brief previously submitted by his former attorney, Levasseur, but now signed by Jenkins. *See* ECF Nos. 85, 99.

## II.   ANALYSIS

The School Defendants and the City Defendants move for summary judgment on the remaining counts in the Amended Complaint: violation of Plaintiff's state constitutional rights under the New Jersey Civil Rights Act (Count 1); false arrest, and violations of Plaintiff's rights to a "secure environment," due process, and equal protection under 42 U.S.C. § 1983

(Count 2); violation of 42 U.S.C. § 1981 (Count 3); conspiracy to violate Plaintiff's civil rights under 42 U.S.C. § 1985 (Count 4); violation of 42 U.S.C. § 1986 (Count 5); and violation of the New Jersey Law Against Discrimination (Count 7). Am. Compl. (ECF No. 8). The complaint asserts all counts against all defendants.

For the reasons stated below, I find that the Defendants have carried their burden of showing that there is no genuine issue for trial as to any of claims in the Amended Complaint. Therefore, summary judgment will be granted in favor of the Defendants. In the interest of a complete and final judgment, I also address Jenkins's motion to vacate the stipulation of dismissal of the amended complaint as to S.L. (ECF No. 96).

## A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243

F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B. Jenkins's Claims

#### 1. Constitutional Claims

Jenkins asserts both state and federal constitutional claims, citing the NJCRA as well as 42 U.S.C. §§ 1981, 1983, 1985, and 1986. This District has regularly interpreted the NJCRA as being parallel to Section 1983. *Hottenstein v. City of Sea Isle City*, No. 11-740, 2013 WL 5603839, at *6 (D.N.J. Oct. 11, 2013) (unreported); *Petit v. New Jersey*, No. 09-3735, 2011 WL 1325614, at *3 (D.N.J. March 30, 2011) (unreported); *Slinger v. New Jersey*, No. 07–5561, 2008 WL 4126181, at *5–6 (D.N.J. Sept. 4, 2008) (unreported), *rev'd on other grounds*, 366 F. App'x 357 (3d Cir. 2010); *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010) (unreported). I therefore consider Jenkins's state and federal constitutional claims together.

> #### a. *Violation of Constitutional Rights Pursuant to Section 1983/NJCRA (Counts 1 and 2)*

In Counts 1 and 2, Jenkins asserts that the Defendants deprived him of his constitutional rights by falsely arresting him, denying him his right to a "safe secure environment," depriving him of his right to due process and equal protection, and subjecting him to involuntary servitude. Am. Compl. ¶¶ 61, 65. He argues that the School Defendants acted under color of state law to deprive him of his constitutional rights by taking his statement after the incident but failing to furnish it to Detective Tingolie, and by in effect ratifying the false statement of S.L. when they contacted the police. By these acts, Jenkins asserts, the School Defendants steered the police investigation and facilitated his arrest. Opp. to School Def. at 3-4 (ECF No. 100). Jenkins also asserts that Tingolie's actions, when viewed in the "overall context of events," violated his constitutional rights "by way of false arrest, a failure to investigate [and] negligence." Opp. to City Defendants at 22 (ECF No. 99). Even viewing the facts

in the light most favorable to the nonmoving party, however, the record offers no evidentiary support for these constitutional claims.

### (1) False arrest

The constitutional tort of false arrest essentially incorporates the elements of the state-law tort.[10] To establish a false arrest claim, the plaintiff must show: (1) that there was an arrest; and (2) that the arrest was made without probable cause. *See Dowling v. City of Phila.*, 855 F.2d 136, 141-42 (3d Cir. 1988). "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). The test of probable cause is an objective one, based on "the facts available to the officers at the moment of arrest." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quoting *Beck v. Ohio*, 379 U.S. 89, 96 (1964)); *Edwards v. City of Phila.*, 860 F.2d 568, 571 n. 2 (3d Cir. 1988)). The existence of probable cause in a Section 1983 case is commonly a question of fact; summary judgment is appropriate, however, when the evidence, viewed in the light most favorable to the plaintiff, could not support a determination that an officer lacked probable cause to arrest. *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997); *Sherwood v. Mulvihill*, 113 F.3d 396, 402 (3d Cir. 1997).

The School Defendants played no role in the decision to arrest Jenkins beyond their initial report of the incident to the police. That report did not amount to an "arrest" or any kind of unlawful seizure. *See Valentino C. v. Sch. Dist. Of Phila.*, No. CIV.A. 01-2097, 2003 WL 177210 at *7 (E.D. Pa. 2003) (finding no unlawful seizure where school officials followed district procedure and called police after student altercation). Like the school officials in *Valentino*, the Orange school officials acted in accordance with school policy by handing the matter over to the local authorities. *See id.* at 5 (applying Fourth Amendment reasonableness standard where school called police); Ex. S at 10. In fact, the intrusion in Jenkins's case was even less significant than the one in *Valentino*. The administrators did not seize Jenkins; he left the school premises following his meeting with them, and was not detained until the police arrived.

---

[10]   In this section, I have cited malicious prosecution cases as well as false arrest cases. For purposes of the probable cause issue, they are parallel. *See Johnson v. Knorr*, 477 F.3d 75, 82-85 (3d Cir. 2007) (when there is probable cause for an arrest on a certain offense, defendants are insulated from both a malicious prosecution and a false arrest claim, so long as the underlying offense is the same for both claims).

SDSMF ¶ 28. Overall, Jenkins has failed to set forth any evidence showing that the School Defendants effected or caused his arrest, or even that they acted unreasonably. At any rate, however, there was probable cause for the arrest

As to both the School and the City Defendants, the false arrest claim fails because there was probable cause for Jenkins's arrest. Before arresting Jenkins, Tingolie received the report of the incident from the school. He reviewed the written statements from S.L., Gaines, and the two security officers. SDSMF ¶ 60 (citing Ex. R at 25). He also obtained a sworn statement from S.L. *Id.* ¶ 33. Those statements all indicated that Jenkins put S.L. in a headlock and carried her into the hallway. *See* Ex. F. Tingolie also spoke with the local prosecutor, who rendered legal advice as to the appropriate charges: aggravated assault and endangering the welfare of a child. CDSMF ¶¶ 25, 52 (citing Ex. G).

After Tingolie put those charges into a complaint, the Municipal County Deputy Court Administrator approved an arrest warrant based on a finding of probable cause. SDSMF ¶¶ 26-28. Although the State rules authorize the administrator to make such a finding, I do not give it the weight of a judicial or grand jury determination of probable cause. I observe, however, that the officer was not precipitate; he consulted the prosecutor and obtained a warrant before acting. The policy of this and every court is to encourage officers to obtain warrants when possible. *See Groh v. Ramirez*, 540 U.S. 551, 571 (2004) (citing *Illinois v. Gates*, 462 U.S. 213, 237 (1983)) (noting the Court's "purpose of encouraging recourse to the warrant procedure").

After the arrest, Tingolie testified before a grand jury. On the basis of his testimony and other evidence, the grand jury indicted Jenkins on the same charges contained in the pre-arrest complaint. SDSMF ¶ 38 (citing Ex. H). That grand jury indictment—which is conclusive proof that probable cause existed at the time of indictment—constitutes probative evidence that probable cause also existed at the time of arrest. *See Kaley v. United States*, 134 S. Ct. 1090, 1097 (2014) ("An indictment fair upon its face, and returned by a properly constituted grand jury, we have explained, conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged.") (internal quotations and citations omitted). It is possible, of course, that an officer who lacked probable cause at the time of arrest only later gathered sufficient evidence to support an indictment. But there are no such indications here. Rather, it appears that the findings of probable cause underlying the arrest warrant and the indictment rested on the same body of evidence. The key statements—the incident report, the four written witness

13

statements, and the sworn statement of S.L.—were sufficient to warrant a reasonable person's believing that Jenkins had committed a criminal offense. *See Wilson*, 212 F.3d at 789.

In response, Jenkins argues that Tingolie's gathering and presentation of facts was incomplete or one-sided. Thus, for example, Tingolie did not speak with any student witnesses, because their parents did not want to cooperate with the investigation. *Id.* ¶ 61 (citing Ex. R at 10). But the student witness statements would only have corroborated the evidence Tingolie did possess; all of the students agreed that Jenkins choked S.L. in some manner.

Tingolie, evidently wary of a *Miranda* issue, also did not review Jenkins's written statement. RSMF1 ¶ 59. That statement, says Jenkins, would have "negated" probable cause. Opp. to School Def. at 5. It is true that Jenkins's account diverged from those of other witnesses—not completely, but to some degree, especially as to the "headlock." It is not true, however, that his partial self-exculpation "negated" probable cause; if that were so, a criminal suspect would only have to deny wrongdoing to insulate himself from arrest.

In short, probable cause is not undermined by the officers' failure to "interview *everyone* who may have possessed relevant information" or to "explore every potentially exculpatory lead." *Trabal*, 269 F.3d at 251. Probable cause is inherently "accusatory," not "adjudicatory." *United States v. Williams*, 504 U.S. 36, 51 (1992). It does not require certainty, or even balance, but a *prima facie* showing: "[P]robable cause does not require [the complainant] to evaluate the totality of circumstances, both inculpatory and exculpatory, as a trier of fact guided by a reasonable doubt standard." *Trabal*, 269 F.3d at 251 (quoting *Carollo v. Supermarkets Gen.*, 597 A.2d 1105 (N.J. Super. Ct. App. Div. 1991)).[11]

Thus, considering a malicious prosecution claim brought by a person detained by store security guards but ultimately cleared of shoplifting, the Third Circuit held:

> While we are required in the present posture of the case to consider the evidence in the light most favorable to the plaintiff, and thus to accept [plaintiff's] explanation that she had paid for

---

[11]   Even a federal prosecutor (who must certainly be held to a higher standard than an arresting officer or a criminal complainant) is not obligated to submit known exculpatory evidence in order to obtain a valid determination of probable cause from a grand jury. *Williams*, 504 U.S. at 51-52. And "the law does not require that a prosecutor explore every potentially exculpatory lead before filing a criminal complaint or initiating a prosecution." *Trabal*, 269 F.3d at 251.

> the coat, *no such obligation was imposed upon the security officer at the time the event occurred*. The fact that the plaintiff protested her innocence then does not establish knowledge of her lack of guilt on the part of the security personnel.

*Martinez v. E.J. Korvette*, 477 F.2d 1014, 1016 (3d Cir. 1973) (emphasis added). "Probable cause does not depend on the state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting." *Id.*; *accord Trabal*, 269 F.3d at 251.

I repeat: the issue is not Jenkins's ultimate guilt or innocence. By definition, probable cause deals in probabilities that may not pan out, particularly when a reasonable doubt standard is applied at trial. Jenkins's protestations do not detract from the showing of probable cause that furnished grounds for his arrest. Jenkins can dispute certain facts, but he cannot deny that the authorities possessed those facts at the time of arrest. Because there is no genuine issue of material fact as to the legality of Jenkins's arrest, summary judgment will be granted for the Defendants on the false arrest component of his constitutional claims.

(2) Due Process

Jenkins also claims that the manner of his arrest and detention violated his right to due process. Opp. to School Def. at 6. To state a claim under Section 1983 for deprivation of procedural due process, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property"; and (2) the procedures available to him did not provide "due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).

The allegations in the amended complaint are not completely clear, but Jenkins appears to base this count on the alleged inadequacy of Tingolie's investigation, which led to Jenkins's arrest and detention. *See* Am. Compl. ¶ 65; Opp. to City Def. at 22; Opp. to School Def. at 6. Beyond Jenkins's own conclusory assertions, the record contains no evidence that Tingolie's investigation was inadequate. As discussed above, Tingolie reviewed the witness statements of Gaines, S.L., and the two security officers, and obtained a sworn statement from S.L. CDSMF ¶¶ 20, 24; SDSMF ¶¶ 60-61. He also consulted with the local prosecutor. CDSMF ¶ 25. He obtained a warrant before arresting Jenkins. The grand jury in effect placed its imprimatur on that probable cause determination when it returned an indictment charging him

15

with aggravated assault and endangering the welfare of a child. SDSMF ¶ 31. In short there was nothing irregular or inadequate about this process.

Jenkins, like every arrestee, was deprived of his liberty. But there is no evidence of a deprivation of liberty without due process of law. Such a claim, based on plaintiff's detention, "is not complete unless and until the State fails to provide due process." *Alvin*, 227 F.3d at 116 (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). The police department, through Tingolie, responded to the incident and investigated S.L.'s claim. The ensuing arrest, supported by probable cause, cannot by itself be the basis for a due process claim. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (citing *Baker v. McCollan*, 443 U.S. 137, 142 (1979)) (discussing false imprisonment claim).

Nor was Jenkins denied due process *after* his arrest.[12] He was duly indicted, and bail was granted. The aggravated assault charge against Jenkins was reduced to one of simple assault on motion of the prosecutor. CDSMF ¶ 32 (citing Ex. O, Judgment of Acquittal). After a non-jury trial, on September 16, 2009, Jenkins was acquitted of the assault count by Hon. Ronald Wigler, Superior Court Judge, and the prosecutor then dismissed the remaining endangerment count. *Id.*

That Jenkins was acquitted does not bespeak a lack of due process, but the opposite. This record discloses that Jenkins received the full panoply of due process protections to which he was entitled after his arrest.

Overall, there is no factual or legal basis for the due process component of Jenkins's constitutional claims. Summary judgment will be granted in favor of the Defendants.

(3) Equal Protection

Jenkins also asserts that he was deprived of equal protection of the laws. Am. Compl. ¶ 65. Neither the complaint nor Jenkins's opposition papers further elaborate on this claim. Because Jenkins asserts elsewhere that he was discriminated against because he is African-American, I will assume that this claim is based on race as well. *See* Opp. to City Def. at 22.

To establish a race-based equal protection claim, a plaintiff must show that the alleged wrongful actions were done with a discriminatory purpose and

---

[12]    No such claim is addressed in Jenkins' pleading or opposition papers, but I touch on it for completeness.

had a discriminatory effect, meaning that "similarly situated individuals of a different race" were treated differently. *United States v. Armstrong*, 517 U.S. 456, 457 (1996); *Oliveira v. Twp. of Irvington*, 41 F. App'x 555, 559 (3d Cir. 2002). The record is bereft of any evidence indicating that Jenkins was the target of purposeful discrimination based on his race, or that other similarly situated individuals were treated differently.

Jenkins's allegations against the School Defendants are limited to the S.L. incident on March 6, 2009, and the surrounding events. The individual School Defendants (Kronin, Stewart, and Smiley) are, like Jenkins, African-American. SDSMF ¶ 80. Of course, that circumstance does not rule out discrimination, but in the absence of other evidence, it does not establish discrimination, either. The record contains no evidence that these Defendants' actions in alerting the police department and cooperating with the investigation were motivated by race. Similarly, there is no evidence that Detective Tingolie or any other individual working for the Orange Police Department purposefully discriminated against Jenkins. There is no evidence so much as suggesting that Jenkins was treated differently from other, similarly situated individuals. *Armstrong*, 517 U.S. at 457. For example, Jenkins does not point to any other substitute teacher or school employee who allegedly committed similar acts but received different treatment.

In sum, the evidence here does not support an equal protection claim. Summary judgment is granted to the Defendants on the equal protection component of Jenkins's constitutional claims.

(4) Other Constitutional Claims

Jenkins makes two additional constitutional claims under the NJCRA and Section 1983. First, Jenkins alleges that he was deprived of his "safety" or his "right to a safe secure environment." Am. Compl. ¶¶ 61, 65. Jenkins cites no federal or state authority that there is a general constitutional right to a "safe secure environment." This claim fails as a matter of law.

Second, Jenkins asserts that he was subjected to involuntary servitude in violation of his constitutional rights. *Id.* ¶ 65. The factual basis for this claim, which quotes the Thirteenth Amendment's prohibition of slavery, is not clear from the complaint or the record. Jenkins's interrogatory responses indicate that this may be just an alternative formulation for his challenge to the legality of his arrest. *See* Ex. K. Interrog. # 15. The legality of Jenkins's arrest, however, has already been established. An arrest supported by probable

cause is not slavery, and is not prohibited by the Thirteenth Amendment. Alternatively, Jenkins might be referring to his employment by the School Defendants. He worked for the BOE for two days as a substitute teacher. SDSMF ¶¶ 5, 7. The record does not contain any indication that Jenkins was coerced to work for the School Defendants, that he worked without pay, or (if so) that he was compelled to do so. *Id.* ¶¶ 7, 8.

In sum, these claims, like the other constitutional claims asserted by Jenkins, do not survive. Summary judgment is granted in Defendants' favor on Counts 1 and 2 of the Complaint.

### b. *Section 1981 (Count 3)*

Section 1981 prohibits racial discrimination in the making of contracts and in property transactions. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 796 (3d Cir. 2001). To establish a claim under 42 U.S.C § 1981, a plaintiff must show: (1) membership in a racial minority; (2) intent to discriminate on the basis of race; and (3) discrimination concerning one or more of the activities enumerated in the statute, including the right to make and enforce contracts. *Id.*

Jenkins does not assert that he had an employment contract, or any other type of contract, with any of the Defendants. Further, as already established, the record does not contain a scintilla of evidence showing that any of the Defendants took any discriminatory or disparate action against Jenkins on the basis of his race. Therefore, he cannot maintain a claim under Section 1981 against the Defendants. Summary judgment is granted to Defendants on Count 3.

### c. *Section 1985 (Count 4)*

Jenkins asserts that the Defendants unlawfully conspired against him in violation of Section 1985. Section 1985 provides a cause of action for the victim of a conspiracy motivated by race discrimination, which I assume to be Jenkins's claim here. *Farber v. City of Paterson*, 440 F.3d 131, 138 (3d Cir. 2006). To support a Section 1985 claim, the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,*

463 U.S. 825, 828-29 (1983). The discriminatory animus required in the second element must be "class-based invidiously discriminatory animus," meaning that the purpose and effect of a violation is to prevent the victim from enjoying "equality of rights as contrasted with his and other citizens' rights." *Farber*, 440 F.3d at 135.

As previously discussed, Jenkins has failed to set forth any evidence showing that he was unlawfully discriminated against by the Defendants. Therefore, his claim for a conspiracy motivated by invidious discriminatory animus fails as a matter of law. Summary judgment is granted to Defendants on Count 4.

### d. Section 1986 (Count 5)

Section 1986 establishes a cause of action against any person who has knowledge of a 1985 violation that is about to be committed, and has the power to prevent or aid in preventing the commission of the violation but neglects or refuses to do so. 42 U.S.C. § 1986. In order to show a violation of Section 1986, the plaintiff must show the existence of a predicate Section 1985 violation. *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). Here, there is no evidence of a Section 1985 violation, so this derivative claim cannot succeed. Summary judgment is granted to Defendants on Count 5.

The foregoing is sufficient to dispose of Jenkins's constitutional claims. I do not reach the Defendants' additional arguments in favor of summary judgment, including qualified immunity (which would appear to apply *a fortiori*), statute of limitations, and failure to meet the prerequisites for municipal liability under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

## 2. NJLAD Discrimination Claim (Count 7)

Jenkins asserts one additional, non-constitutional claim. Count 7 of the Amended Complaint alleges that the Defendants violated his rights under the NJLAD. Am. Compl. ¶ 84. The Amended Complaint does not allege any specific acts in violation of the NJLAD. Jenkins's brief does not make any arguments that specifically pertain to NJLAD. In his interrogatory responses, however, Jenkins states that the Defendants discriminated against him by failing to "provide and/or seek to establish a working relationship" as they did with other employees of the high school. Ex. K, Interrog. #8. The NJLAD claim by its

nature applies to the employment relationship, and is therefore limited to the School Defendants.[13]

Jenkins has put forth no direct evidence of discrimination by the School Defendants. I will nevertheless apply the three-step, burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to assess Jenkins' discrimination claims under the NJLAD. *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954-55 (N.J. 1999). At the first step, the plaintiff must prove by a preponderance of the evidence that: (1) he was in the protected group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) that he nevertheless was fired; and (4) that [the employer] sought someone to perform the same work after he left. *Mogull v. CB Commercial Real Estate Grp., Inc.*, 744 A.2d 1186, 1193 (N.J. 2000). Establishing the prima facie case is not an onerous requirement. *Bergen Commercial Bank*, 723 A.2d at 955.

A prima facie case creates a presumption of discrimination, and the burden then shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for its actions against plaintiff. *Id.* If the employer produces such evidence, the presumption of discrimination disappears. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)). The burden of production then shifts back to the employee, who has the "opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination." *Id.* (citations omitted). The employee may meet this burden by either persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Id.*

Jenkins's employment discrimination claim fails as a matter of law. He has not established a prima facie case of employment discrimination because

---

[13]   Liability under the NJLAD may only be imposed against an employer. *Cicchetti v. Morris Cnty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008). Individual employees and supervisors are not "employers" under the LAD, and their liability may arise, if at all, only through the "aiding and abetting" mechanism of the LAD statute. *Id.* To prove an employee liable as an aider and abettor, Plaintiff must show: (1) the employer whom the defendant aided performed a wrongful act causing an injury; (2) the defendant was generally aware of his role as part of an overall illegal or tortious activity at the time that he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation. *Id.*; *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999) (defining aiding and abetting liability).

he submits no evidence that he was performing his job at a level that met his employer's legitimate expectations. Jenkins worked at the high school for a total of two days. SDSMF ¶¶ 5, 7, 8. The S.L. altercation occurred on the morning of his second (and last) day at the school. *Id.* ¶¶ 12, 18. He did not receive any kind of evaluation before the incident. Immediately after it, the School Defendants requested that he complete a written statement and met with him. *Id.* ¶¶ 18, 21-23. The matter was then turned over to the local police. *Id.* ¶¶ 26, 65. These facts do not establish that Jenkins was meeting his employer's "legitimate expectations"; nor do they give rise to an inference of discriminatory motive.

The School Defendants have clearly articulated a legitimate, non-discriminatory reason for their actions on the day of the S.L. incident, as well as their decision to stop using Jenkins as a substitute teacher. *See* School Def. Br. at 25. Jenkins blames S.L. for the altercation, but does not dispute that it occurred. *Id.* ¶¶ 12, 18. Multiple witnesses saw Jenkins carrying S.L. down the hallway. *Id.* ¶ 13; RSMF1 ¶ 13. Obtaining Jenkins's statement and convening a meeting were reasonable measures in response to a physical altercation between a teacher and a student on school grounds. They do not suggest a discriminatory motive. Nor can the school be faulted for cooperating with the investigation after S.L.'s mother filed a police report. In April 2009, when the BOE removed Jenkins from the active substitute list for "unacceptable performance," he had been criminally charged. SDSMF ¶ 37 (citing Ex. M, Kronin Letter). Again, no discrimination can be inferred from this reasonable administrative action.

Jenkins presents no evidence that the School Defendants' actions were motivated by race, gender, or any another protected classification. He has failed to rebut the School Defendants' overwhelming showing of a reasonable, non-discriminatory purpose with any evidence that it was pretextual.

There is no genuine issue of material fact regarding Jenkins's NJLAD claim. The Defendants will also be granted summary judgment on Count 7.

### C. Motion to Vacate Stipulation of Dismissal

Jenkins moves separately under Fed. R. Civ. P. 60 to vacate the stipulation of dismissal with prejudice as to S.L. (ECF No. 96). Because the motions for summary judgment have been granted, I will tie up this loose end before terminating the case.

On May 3, 2013 (ECF No. 77), a stipulation was entered dismissing the case with prejudice as to S.L. (*See* Procedural History, p. 9, *supra*.). Rule 41(a)(1), Fed. R. Civ. P., provides that the "plaintiff may dismiss an action without a court order by filing . . . (ii) a stipulation of dismissal signed by all parties who have appeared." *Id.*; *see also First Nat'l Bank of Tom's River N.J. v. Marine City, Inc.*, 411 F.2d 674, 677 (3d Cir. 1969). Otherwise, a court order is required. *See* Fed. R. Civ. P. 41(a)(2).

The threshold issue is whether this stipulation—signed by counsel for Jenkins and S.L., but not by counsel for the other Defendants—is effective. Although no party raises the issue, it would appear to fall short of the Rule 41(a)(1) requirement that it be signed "by *all* parties who have appeared." (Emphasis added.)[14] I note, however, that no other defendant objects; they are the only parties with standing to complain, and their rights are in no way affected. If this is a deviation from the Rule, it is a harmless one. "[C]ourts have allowed stipulations that do not conform with all of the requirements of Rule 41." *Kabbaj v. Am. Sch. of Tangier*, 445 F. App'x 541, 544 (3d Cir. 2011) (not precedential; noting that some courts have allowed oral, rather than written, stipulations).

Jenkins argues that the stipulation should be vacated because he did not consent to its filing by his first attorney, Foster, several days after he had filed a substitution of counsel. *See* Stipulation (ECF No. 77); Substitution of Attorney (ECF No. 75). I assume this was an ordinary case of lag time. In any event, however, Jenkins's second attorney, Levasseur, was fully involved in the execution and delivery of the stipulation. *See* ECF Nos. 83, 84. Levasseur has represented to the Court that he discussed the claims against S.L. with Jenkins on several occasions in April and May of 2013, and that his client gave consent to the dismissal. Levasseur Letter (ECF No. 84). There has been no waiver of the attorney-client privilege or evidentiary hearing to explore the underlying facts.

I need not hold such a hearing, however, because the relief requested is futile. Mr. Levasseur has stated that the stipulation of dismissal was entered to avoid the potential "impositions of costs and sanctions" for the filing of frivolous pleadings. (ECF No. 84). His concerns were realistic; the claims as against S.L. are so lacking in merit as to be frivolous, and by withdrawing them, counsel might well have saved Jenkins from the payment of sanctions.

---

[14]   The brief for S.L. on this motion employs ellipses to omit this language from its quotation of the Rule. (ECF No. 107 at 7 (Br. at 3)). I find that omission highly questionable.

I therefore would

(a) deny the motion to vacate the stipulation of dismissal as futile;

(b) grant summary judgment as to S.L. for the reasons expressed above in Section II.B of this opinion; and

(c) revive and grant S.L.'s motion to dismiss (ECF No. 50), which was briefed but never decided by the Court because the stipulation of dismissal intervened.[15]

The most obvious of the grounds asserted for dismissal are as follows:

*First,* the constitutional claims (Counts 1-5) require "state action" by a government entity or employee. Thus, for example, 42 U.S.C. § 1983 provides a remedy for a constitutional deprivation perpetrated "under color of state law." The state equivalent, N.J.S.A. 10:6-2, provides a state-law remedy for such a deprivation "under color of law." S.L., a 15-year-old high school sophomore, was obviously in no position to commit such a violation. She is not a state actor and does not exercise state power. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct") (internal citations and quotations omitted); *Perez v. Zagami, LLC,* 94 A.3d 869, 877 (N.J. 2014) (stating that construing N.J.S.A. 10:6-2 to allow remedies against private actors would be a "radical change" from the Legislature's intent and would "dramatically expand the liability of private individuals beyond its current bounds.")

*Second,* the remaining count (Count 7, the LAD claim) does not apply to S.L. as a matter of law. The LAD applies only to the employer-employee relationship. *Cicchetti v. Morris Cnty. Sheriff's Office,* 947 A.2d 626, 645 (N.J. 2008). S.L. was not Jenkins's employer, nor was she a co-employee.

As noted, the grounds for summary judgment discussed in Part II.B, *supra,* are incorporated here. S.L. also cites further grounds for dismissal. These include failure to state a claim, statute of limitations, and collateral

---

[15]   There can be no claim of unfair surprise in considering these grounds. The original motion to dismiss was fully briefed. S.L.'s motion papers and reply were electronically filed. (ECF nos. 50, 57) Jenkins's brief in opposition apparently was not electronically filed, but is stamped "received" as of December 17, 2012, and is in the Court's file. The grounds asserted in S.L.'s motion to dismiss were restated in her brief in opposition to Jenkins's motion to vacate the stipulation (ECF No. 106), and Jenkins replied to them (ECF No. 107).

estoppel/res judicata based on a dismissed civil action brought by Jenkins.[16] Because the grounds asserted above are sufficient to dispose of the case, I do not reach these alternative grounds.[17]

### III.   CONCLUSION

For the foregoing reasons, summary judgment is granted for the Defendants on all counts. In addition, Jenkins's motion to vacate the stipulation of dismissal as to S.L. is denied.

An Order will be filed in accordance with this Opinion.

**Kevin McNulty**
**United States District Judge**

Dated: September 29, 2014

---

[16]    Claim preclusion has three elements: (1) a final judgment on the merits; (2) the prior suit involved the same parties or their privies; and (3) the subsequent suit is based on the same transaction or occurrence. *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 591 A.2d 592, 599 (N.J. 1991) (state law); *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984) (federal law). Issue preclusion, or collateral estoppel, requires: (1) identity of issues; (2) actual litigation of the issue in the prior proceeding; (3) a final judgment on the merits; (4) that the determination of the issue was essential to the prior judgment; and (5) identity or privity of parties. *See In re Estate of Dawson,* 641 A.2d 1026, 1034-35 (N.J. 1994). On August 31, 2011, Jenkins filed a civil action against S.L. in New Jersey Superior Court, Essex County, Special Civil Part, No. DC-023951-11. He sued for "Damages from assault & trial costs & lost wages." The incident for which he sued was "Assault occur 3.6.09." This clearly refers to the March 6, 2009, altercation with S.L. in the Orange classroom. (ECF No. 50-2, Ex. B). That State action was dismissed by order dated November 4, 2011. (ECF No. 50-2, Ex. C). The order states that the motion was opposed; the grounds for dismissal were stated orally on the record, but no transcript is included. If I were to consider this as an independent ground for dismissal, I would verify whether this was a judgment on the merits. If so, it would preclude further litigation of claims arising from the same issues and from claims that were or could have been brought. *See generally Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); 28 U.S.C. § 1738.

[17]    In his opposing briefs, Jenkins states that he seeks leave to amend his complaint to address any deficiencies. *See* Opp. to City Def. (ECF No. 99) at 21; Opp. to School Def. (ECF No. 100) at 10. Such an amendment—particularly after the close of discovery, in connection with a meritorious defense motion for summary judgment—will not be granted based on a passing reference in a brief. I do not invite such a motion, but if it were filed, it would have to be presented in proper form, pursuant to Fed. R. Civ. P. 15, with a proposed amended pleading attached.